IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| **HEAVY DUTY PRODUCTIONS, LLC** | § | |
| | § | |
| V. | § | A-14-CV-974-LY |
| | § | |
| **BANDWDTH, LLC, COHERENTRX,** | § | |
| **INC., and THOMAS R. HARTLE** | § | |

<u>REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE</u>

TO:   THE HONORABLE LEE YEAKEL
       UNITED STATES DISTRICT JUDGE

Before the Court are: Defendants' Motion to Dismiss for Lack of Personal Jurisdiction (Dkt. No. 3); and Plaintiff's Response (Dkt. No. 4). The District Court referred the above-motion to the undersigned Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. §636(b) and Rule 1(c) of Appendix C of the Local Rules of the United States District Court for the Western District of Texas, Local Rules for the Assignment of Duties to United States Magistrate Judges.

**I.  GENERAL BACKGROUND**

Plaintiff Heavy Duty Productions, LLC ("Heavy Duty") is a Massachusetts limited liability company with its principal place of business in Travis County, Texas. Dkt. No. 1-1.  Before moving to Texas, Heavy Duty was based out of California.  Dkt. No. 3, Ex. A at ¶12-13.  Defendant Bandwdth[1] is a dissolved Delaware limited liability company that was headquartered in California. *Id.* at ¶ 2. It developed mobile applications primarily for use in the music industry. *Id.* at ¶ 11. Defendant CoherentRX is a Delaware corporation with its principal place of business in Michigan. *Id.* at ¶ 16. It develops mobile applications for use in the healthcare industry. *Id.* at ¶ 17. Defendant

---

[1]This is, in fact, the correct spelling of the defendant's name.  The record does not reflect why they chose to misspell "bandwidth," but there is no doubt a good reason for it.

Thomas Hartle is an individual residing in Michigan. *Id.* at ¶ 27-28. He is a founder and president of both Bandwdth and Coherent. *Id.* at ¶ 2.

Heavy Duty claims that it performed services for Bandwdth in 2010-11, and was not paid for those services. It now brings a claim for payment on a sworn account. Dkt. No. 1-1. Heavy Duty further alleges that Hartle and Coherent are liable as successors to Bandwdth, and also that they engaged in fraudulent transfers of assets from Bandwdth when it closed its doors. *Id.* at 4-5. Suit was originally filed in state court on September 11, 2014, styled *Heavy Duty Productions, LLC v. Bandwdth, LLC, CoherentRX, Inc., and Thomas R. Hartle*, No. D-1-GN-14-003616, in the 353rd Judicial Court, Travis County, Texas. On October 27, 2014, the defendants removed the case to this Court on the basis of diversity. They now move to dismiss the case for lack of personal jurisdiction.

## II. ANALYSIS

Defendants assert that Heavy Duty's sole jurisdictional allegation is that "Bandwdth has entered into agreements and accepted services from [Heavy Duty] in the State of Texas." Dkt. No. 1-1 at 1. Defendants contend that to the extent that there was a business relationship between Bandwdth and Heavy Duty, that entire relationship took place in California and terminated before Heavy Duty moved to Texas. Dkt. No. 3-1 at ¶¶ 12-14. According to Defendants, the mere fact that Heavy Duty is now located in Texas is not enough to subject Defendants to suit in Texas. Additionally, Defendants argue, because the only basis for jurisdiction over Coherent and Hartle is successor liability, and neither Coherent nor Hartle has contacts with Texas or relationships with Heavy Duty separate from whatever Bandwdth had, there is no basis for personal jurisdiction over them either. Heavy Duty responds that the Court has specific jurisdiction over all Defendants because Bandwdth's contacts with Texas give rise to the claims Heavy Duty asserts against them.

**A.     Legal Standard**

Under Federal Rule of Civil Procedure 12(b)(2), the "plaintiff bears the burden of establishing a district court's jurisdiction over a non-resident." *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 609 (5th Cir. 2008). A plaintiff must make a prima facie showing that the defendant is subject to personal jurisdiction; "[p]roof by a preponderance of the evidence is not required." *Bullion v. Gillespie*, 895 F.2d 213, 217 (5th Cir. 1990) (citing *D.J. Invs. Inc. v. Metzeler Motorcycle Tire Agent Gregg, Inc.*, 754 F.2d 542, 545–46 (5th Cir. 1985)). At the motion stage, "uncontroverted allegations in the plaintiff's complaint must be taken as true, and conflicts between the facts contained in the parties' affidavits must be resolved in the plaintiff's favor." *Id.*

"A federal court sitting in diversity may exercise personal jurisdiction over a non-resident defendant (1) as allowed under the state's long-arm statute; and (2) to the extent permitted by the Due Process Clause of the Fourteenth Amendment." *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 398 (5th Cir. 2009). The Texas long-arm statute extends to the limits of due process. *Id.* To satisfy due process, the plaintiff must demonstrate "(1) that the non-resident purposefully availed himself of the benefits and protections of the forum state by establishing 'minimum contacts' with the state; and (2) that the exercise of jurisdiction does not offend 'traditional notions of fair play and substantial justice.'" *Johnston*, 523 F.3d at 609.

"A defendant establishes minimum contacts with a state if 'the defendant's conduct and connection with the forum state are such that [he] should reasonably anticipate being haled into court there.'" *Nuovo Pignone, SpA v. Storman Asia M/V*, 310 F.3d 374, 379 (5th Cir. 2002) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985)). "There are two types of 'minimum contacts': those that give rise to specific personal jurisdiction and those that give rise to general

personal jurisdiction." *Lewis v. Fresne*, 252 F.3d 352, 358 (5th Cir. 2001).  A court has general jurisdiction over a nonresident defendant "to hear any and all claims" against him when his contacts with the state are so "'continuous and systematic' as to render [him] essentially at home in the forum." *Goodyear Dunlop Tires Operations v. Brown*, 131 S.Ct. 2846, 2851 (2011).  As noted, Heavy Duty does not contend that there is general jurisdiction over the Defendants, so the only issue here is whether the Court has specific jurisdiction over the Defendants.

"In contrast to general, all-purpose jurisdiction, specific jurisdiction is confined to adjudication of 'issues deriving from, or connected with, the very controversy that establishes jurisdiction.'" *Id.* at 2851 (citation omitted).  The Fifth Circuit frames the specific jurisdiction issue with a three-step analysis:

> (1) whether the defendant has minimum contacts with the forum state, i.e., whether it purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable.

*Monkton Ins. Servs. v. Ritter*, 768 F.3d 429, 433 (5th Cir. 2014) (citing *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 271 (5th Cir. 2006)).  The plaintiff bears the burden of satisfying the first two prongs; if the plaintiff is successful, the burden shifts to the defendant to show that exercising jurisdiction would be unfair or unreasonable.  *Seiferth*, 472 F.3d at 271.  The main question is "whether there was 'some act by which the defendant purposefully avail[ed] [himself] of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Goodyear,* 131 S.Ct. at 2854 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).  The Supreme Court recently stated that "[f]or a State to exercise jurisdiction consistent

with due process, the defendant's suit-related conduct must create a substantial connection with the forum State." *Walden v. Fiore*, 134 S.Ct. 1115, 1121 (2014).

In another case involving the reach of personal jurisdiction, two years ago the undersigned wrote the following:

> The law of personal jurisdiction, which stems from constitutional principles, is judge-made, and although it has evolved greatly over the past 100 years, it remains obtuse and burdened by conclusory concepts. The fundamental principles are handed down by the Supreme Court, interpreted and refined by the courts of appeal, and then applied to real cases by the district courts. The result is that tens of thousands of cases addressing personal jurisdiction are cluttered with the same phrases, derived from seminal Supreme Court decisions, and repeated like mantras. Courts routinely recite the facts of a case, and then, using the doctrinal phrases, simply pronounce that a defendant "purposefully availed itself of the privilege of conducting activities" in the forum or "purposefully directed its activities" toward the forum. This problem of unenlightening conclusory phrases in jurisdictional case law is not new, as it was noted more than 80 years ago by Learned Hand, as he discussed the notion of a corporation's "presence" for purposes of jurisdiction: "It scarcely advances the argument to say that a corporation must be 'present' in the foreign state, if we define that word as demanding such dealings as will subject it to jurisdiction, for then it does no more than put the question to be answered." *Hutchinson v. Chase & Gilbert, Inc.*, 45 F.2d 139, 141 (2d Cir.1930). Judge Hand remarked that "it has become quite impossible to establish any rule from the decided cases; we must step from tuft to tuft across the morass." *Id.* at 142.
>
> Although the Supreme Court has tried in numerous cases to bring some order to this area of the law, the morass remains. In the seminal case of *International Shoe*, the Court defended its inability to state bright line rules by invoking the fact that the inquiry was a constitutional one:
>
>> It is evident that the criteria by which we mark the boundary line between those activities which justify the subjection of a corporation to suit, and those which do not, cannot be simply mechanical or quantitative. The test is not merely, as has sometimes been suggested, whether the activity, which the corporation has seen fit to procure through its agents in another state, is a little more or a little less. Whether due process is satisfied must depend rather upon the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure.

> 326 U.S. at 319 (citations omitted).  Even after thirty years to sort out what *International Shoe*'s "minimum contacts" test means, the Court made little progress:
>
>> Like any standard that requires a determination of "reasonableness," the "minimum contacts" test of *International Shoe* is not susceptible of mechanical application; rather the facts of each case must be weighed to determine whether the requisite "affiliating circumstances" are present. . . .  We recognize that this determination is one in which few answers will be written in black and white.  The greys are dominant, and even among them the shades are innumerable.  *Kulko v. Superior Court*, 436 U.S., 84, 92 (1978).

*Transverse, LLC v. Info Directions, Inc.*, 2013 WL 3146838 at *3-4 (W.D. Tex. June 17, 2013).

Unfortunately, not much has changed in the past two years, and the law of personal jurisdiction remains as clear as mud.  Indeed, if anything, technology, the internet and global electronic commerce have stretched the concept of "jurisdiction" close to a breaking point.  A few helpful principles have emerged, however.  First, for contacts with a state to subject a party to suit there, the contacts must be "contacts that the *'defendant himself'* creates with the forum State." *Walden*, 134 S.Ct. at 1122 (quoting *Burger King*, 471 U.S. at 475) (emphasis added).  Second, the principles and limits of jurisdiction "principally protect the liberty of the nonresident defendant—not the convenience of the plaintiff[ ] or third parties."  *Id.* (citing *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291-92 (1980)).  The Supreme Court has "consistently rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum State."  *Id.*  "Put simply, however significant the plaintiff's contacts with the forum may be, those contacts cannot be 'decisive in determining whether the defendant's due process rights are violated.'"  *Id.* (quoting *Rush v. Savchuk*, 444 U.S. 320, 332 (1980)).  Stated another way, "plaintiff cannot be the only link between the defendant and the forum.

Rather, it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him." *Id.*

### B.  Jurisdictional Facts

It is undisputed that Bandwdth initially engaged in business with Heavy Duty while Heavy Duty was located in San Francisco, California. At that time, there were absolutely no connections between Texas and the parties' relationship. Heavy Duty notified Bandwdth via e-mail on August 18, 2010, that it had relocated and its new address was in Austin, Texas. Heavy Duty owner/operator Jim Lewin identified this address as his home address in the same e-mail in which he stated to Bandwdth "[p]lease accept my sincere thanks for offering to send payments to my home instead of handing them to me in twenties at a midnight blackjack table in Reno." Dkt. No. 4-2 at 3. Heavy Duty argues that it performed services for Bandwdth after Heavy Duty relocated to Austin, and that Bandwdth failed to pay for those services. Heavy Duty offers as evidence a bill submitted to Bandwidth dated December 23, 2011, for services rendered from May 20, 2010, to March 31, 2011. Dkt. No. 4-3. Heavy Duty also submits a number of e-mails between Hartle and Lewin relating to ongoing business between Heavy Duty and Bandwdth. Dkt. No. 4-1. It notes that Hartle visited Austin from March 14-20, 2011, and stayed at Lewin's home. Dkt. No. 4-1 at ¶ 5. Lewin states that while Hartle was there, the two met regarding the ongoing business between Heavy Duty and Bandwdth. *Id.* Finally, in a marketing brochure, Bandwdth lists its "OFFICES (VIRTUAL)" as "NYC, Austin, TX, and LA." Dkt. No. 4-4.[2]

---

[2] Immediately above this statement is the following: "CORPORATE LOCATIONS: Sonoma, CA; Buenos Aires, AR (Development)." *Id.*

**C.     Application**

Heavy Duty has failed to proffer sufficient evidence that Bandwdth or the other Defendants aimed their activities at Texas, or availed themselves of the privileges of conducting business in Texas, such that they are subject to suit here.  The only connection Defendants have with the state of Texas is that one of them—Bandwdth—entered into a contract with Heavy Duty while its principal place of business was located in California, and then continued the relationship after Heavy Duty relocated to Texas. Continuing the relationship amounted to communicating with Heavy Duty (mainly via email) regarding the terms and performance of their relationship.  The Fifth Circuit has explicitly held that "merely contracting with a resident of the forum state does not establish minimum contacts."  *Moncrief Oil Int'l v. OAO Gazprom*, 481 F.3d 309, 311 (5th Cir.2007).  *See also, Burger King Corp.*, 471 U.S. at 478.  Furthermore, "communications relating to the performance of a contract themselves are insufficient to establish minimum contacts." *Freudensprung v. Offshore Technical Servs., Inc.*, 379 F.3d 327, 344 (5th Cir. 2004).

In support of its motion Heavy Duty also points to the marketing document in which Bandwth states it has a "virtual office" in Austin, Texas. Dkt. No. 4-4. But this same document also states that Bandwdth has no employees and that "the Company currently operates virtually, using freelancers for all design, editorial, production, development, and marketing functions." Immediately preceding the list of "virtual" locations is a list of "corporate locations"—which sounds much less "virtual" and much more "real"—and these include only Sonoma and Buenos Aires.  It is not at all clear that identifying a "virtual office" in a state has any significance from the jurisdictional standpoint, particularly when the company listing this "office" also states that it has no employees and operates "virtually."

The number and extent of the communications between Defendants outside of Texas, to Heavy Duty in the state, is also insufficient to show that Defendants were "aiming" their conduct at Texas. Where the exchange of communications rests on nothing except "the mere fortuity that [plaintiff] happens to be a resident of the forum," it is insufficient to establish specific jurisdiction. *MH Outdoor Media, LLC v. Am. Outdoor Advertising, LLC,* No. Civ. H–14–898, 2014 WL 4537959, at *3 (S.D. Tex. Sept. 10, 2014). *See also, McFadin v. Gerber*, 587 F.3d 753, 759 (5th Cir. 2009) (no personal jurisdiction in Texas even though Colorado saleswoman's contact information appeared on website, she had contract with Texas manufacturer, and her representative sold goods in Texas, because contract centered around saleswoman's operations outside Texas); *Holt Oil & Gas Corp. v. Harvey*, 801 F.2d 773, 778 (5th Cir. 1986) (no specific jurisdiction where defendant communicated extensively with, sent payments to, and contracted with Texas party for drilling contract to be performed in Oklahoma). There simply is not enough evidence that Defendants aimed any of their actions at Texas, so as to establish personal jurisdiction over them here.

Heavy Duty also contends that its claims arise from activity that is specifically regulated by Texas consumer protection statutes, and under Texas law, an act governed by these statutes that impacts a Texas resident will bestow jurisdiction over the offending party. *See Siskind v. Villa Found. for Educ., Inc.*, 642 S.W.2d 434, 436-37 (Tex. 1982). The holding in *Siskind,* however, is not premised on the notion that a violation of a Texas consumer protection statute automatically confers specific jurisdiction over the alleged out-of-state party; rather *Siskind* is a precursor to the "effects" test spelled out in *Calder v. Jones*, 465 U.S. 783 (1984). As noted in the undersigned's 2013 decision referenced earlier,

> The Fifth Circuit has stated that a finding of jurisdiction under *Calder* based on "effects" in the forum state "is rare." *Stroman Realty, Inc. v. Wercinski*, 513 F.3d 476, 486 (5th Cir.2008), *cert. denied*, 555 U.S. 816 (2008). The circuit has further clarified that the effects test "is not a substitute for a nonresident's minimum contacts that demonstrate purposeful availment of the benefits of the forum state," and "the key to *Calder* is that the effects of an alleged intentional tort are to be assessed as part of the analysis of the defendant's relevant contacts with the forum." *Allred v. Moore & Peterson*, 117 F.3d 278, 286 (5th Cir.1997), *cert. denied*, 522 U.S. 1048, (1998).

*Transverse*, 2013 WL 3146838 at *6.

As noted at the outset, this case involves a suit for breach of contract, suit on an account, and claims that Defendants violated the Texas Uniform Fraudulent Transfer Act, TEX. BUS. C. CODE § 24.002 *et seq* ("TUFTA"). The argument now being considered is focused on the TUFTA claims, which assert that each of the Defendants intentionally participated in the fraudulent transfer of Bandwdth's assets to Coherent in an effort to avoid payment of Heavy Duty's invoices. To establish a claim under TUFTA, a plaintiff must prove that (1) she is a "creditor" with a claim against a "debtor"; (2) the debtor transferred assets after, or a short time before, the plaintiff's claim arose; and (3) the debtor made the transfer with the intent to hinder, delay, or defraud the plaintiff. *Nwokedi v. Unlimited Restoration Specialists, Inc.*, 428 S.W.3d 191, 203–05 (Tex. App. – Houston 1st Dist.2013, pet. denied). Heavy Duty maintains that the following facts support its fraudulent transfer claim:

- From and after August 6, 2010, Heavy Duty Productions provided services for Bandwdth from Austin, Texas, and performed those throughout 2010 and 2011.

- Throughout 2010 and even through 2014, Jim Lewin, on behalf of Plaintiff, communicated regularly with Hartle, on behalf of the Defendants, concerning the work that was being performed, ongoing work, and request for payment. These communications include substantial email communications between the two.

- Mr. Hartle continued to represent that payment would be made. Plaintiff did not discover until April of 2014 that no payment would be made and, instead, that

10

> Bandwdth was being "dissolved" and that Mr. Hartle was engaged in a new business, CoherentRX, Inc., which would utilize the business model, contacts and knowledge of Bandwdth. Some of the business contacts that lead to work performed by Coherent originated from Bandwdth's business activities.
>
> • Mr. Hartle and Coherent issued stock, notes or other debt or equity interests in Coherent to former Bandwdth investors for no new consideration, but made no such offer to Heavy Duty Productions nor any payment to Heavy Duty Productions.

Dkt. No. 4 at 2 (citations omitted).  Heavy Duty contends that specific jurisdiction exists because Defendants' this conduct amounts to an intentional tort intended, or highly likely, to harm Heavy Duty in Texas.

Even when the issue is focused on a tort, and not a pre-existing contractual relationship, "the [jurisdictional] inquiry still 'focuses on whether the conduct underlying the claims was purposefully directed at the forum state.' '[T]he plaintiff's residence in the forum, and suffering of harm there, will not alone support jurisdiction under *Calder*." *Transverse*, 2013 WL 3146838 at *8 (citations omitted).  Thus, the ultimate issue is:  did Defendants "'purposefully direct' or 'expressly aim' its activities at Texas?" *Id.*  With regard to Coherent, which allegedly received assets from Bandwdth, Heavy Duty has failed to point out any contacts between Coherent and Texas related to the tort in issue.  As stated in *Mullins v. TestAmerica*, "we are skeptical of [the plaintiff's] suggestion that a non-resident defendant's receipt of assets transferred with an intent to hinder, delay, or defraud a creditor *ipso facto* establishes personal jurisdiction in the state where a complaining creditor resides." *Mullins*, 564 F.3d at 400.  As noted, the "effects" test in *Calder* does not supplant the need for Bandwdth to demonstrate minimum contacts that show Coherent aimed actions at Texas.  As the Fifth Circuit noted in *Mullins*,

> the premise of the fraudulent transfer claim asserted by [Plaintiff] . . . requires only a finding of fraudulent intent on the part of the "debtor," not the transferee.

> Knowingly accepting a fraudulent transfer may subject a transferee to liability, but such conduct is not necessarily tantamount to committing a wrongful act purposefully aimed at a creditor of the transferor in his state of residence. . . .We are thus doubtful that personal jurisdiction exists over the recipient of a fraudulent transfer anywhere a complaining creditor files suit simply by virtue of the creditor's residence in that forum.

*Mullins*, 564 F.3d at 401 (citations omitted). Heavy Duty has failed to overcome this problem with regard to Coherent.

With regard to Bandwdth and Hartle, their alleged act of dissolving a company without paying its debts is insufficient to establish that they were specifically directing the resultant harm at its Texas debtor. As the Fifth Circuit has stated,

> recognizing that such collateral consequences may be far-reaching (particularly in a commercial tort situation such as the one before us), our precedent holds that consequences stemming from the actual tort injury do not confer personal jurisdiction at the site or sites where such consequences happen to occur.

*Jobe v. ATR Marketing, Inc.*, 87 F.3d 751, 753 (5th Cir. 1996). *See also Hoffman v. L & M Arts*, 774 F.Supp.2d 826, 844 (N.D. Tex.2011) (allegedly tortious acts occurring outside of Texas do not establish personal jurisdiction over the defendant on tortious interference claim). In this case, Bandwdth, a Delaware corporation headquartered in California, transferred its assets to Coherent, a Delaware corporation with its principal place of business in Michigan. As a result, Heavy Duty claims it suffered a financial injury in Texas. These facts do rise to the level of being purposeful tortious acts directed at Texas. In fact, the portion of the parties' relationship that arguably had something to do with the Texas—the e-mails and communications by Defendants with Heavy Duty in Texas—do not relate in any way to the fraudulent transfer claim. Assuming that a fraudulent transfer did occur, it occurred outside of Texas and did not involve any Texas property or property formerly owned by a Texas entity.

The cases Heavy Duty relies upon in support of its argument under TUFTA are not on point. For example, *Mullins*, *supra*, involved a multitude of contacts with the forum state. The Court in *Mullins* found that the actions that thwarted the party's right to payment under its contracts "were executed by [defendant] Faraway in Texas, where Faraway resides," and that the debtor-creditor relationship at issue was "centered in Texas." *Mullins,* 564 F.3d at 401. Additionally, *Mullins* involved a claim that one major creditor—located in Texas—was singled out as the only creditor not payed as a result of the allegedly fraudulent transfer. Here, there is no evidence that this is the case (as discussed below).

In *Dontos v. Vendomation NZA Ltd.*, 582 Fed. Appx. 338 (5th Cir. 2014), the court based its jurisdictional finding on the fact that the defendants allegedly fraudulently transferred assets specifically to prevent Texas plaintiffs from collecting a pre-existing Texas judgment, thus demonstrating that the Texas residents were the express targets of the defendants' acts. This is not the case here, where Heavy Duty's complaint is that Bandwdth fraudulently transferred its assets in order to avoid payment of its bill. Heavy Duty fails to plead that Bandwdth acted to single it out as a debtor. While Lewin's Affidavit states "Heavy Duty Productions was one of the few vendors, if not the only vendor, that was not paid by Bandwdth" he also states that "after [Hartle] told me in April 2014, that Bandwdth needed to be dissolved, I learned that Bandwdth had been administratively dissolved by the State of Delaware in 2012 for Bandwdth's failure to pay Delaware LLC tax for 2012 and prior years." Dkt. No. 4-1. Thus, the evidence here shows that Bandwdth was failing to pay other creditors as well. The TUFTA claims here do not establish the sort of targeted activity described in *Mullins* and *Dontos*. *See, e.g., Allen & Vellone, P.C. v. Pino*, 2014 WL 1040634 (D. Colo. Mar. 18, 2014) ("Fairly construed, Plaintiffs' allegation is that they—like all

other creditors—were negatively affected by Defendant Pino's actions. That is a far cry from the purposeful, targeted actions that were established in *Mullins*."); *AAA Cooper Transp. v. Wes–Pak, Inc.*, 2012 WL 847470 (M.D. Ala. Mar. 13, 2012) ("[T]here is no evidence that AAA Cooper was paid less than other creditors or treated differently than any of Wes–Pak's other creditors.").

Because the first two factors of the specific jurisdiction test are not met, the Court need not address whether exercising jurisdiction is fair and reasonable—the third factor—which is only considered "[o]nce it has been decided that a defendant purposefully established minimum contacts within the forum State. . . ." *Burger King*, 471 U.S. at 476. Even acknowledging that the third factor can "sometimes serve to establish reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required," *id.* at 477, the first two factors are too weak here to be saved by the third.

## III. RECOMMENDATION

Based upon the foregoing, the undersigned **RECOMMENDS** that the District Court **GRANT** Defendants' Motion to Dismiss for Lack of Personal Jurisdiction (Dkt. No. 3) and **DISMISS** this case **WITHOUT PREJUDICE** for lack of jurisdiction.

## IV. WARNINGS

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report

shall bar that party from *de novo* review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *See* 28 U.S.C. § 636(b)(1)(c); *Thomas v. Arn*, 474 U.S. 140, 150-53 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

To the extent that a party has not been served by the Clerk with this Report & Recommendation electronically pursuant to the CM/ECF procedures of this District, the Clerk is directed to mail such party a copy of this Report and Recommendation by certified mail, return receipt requested.

SIGNED this 12th day of May, 2015.

_____
ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE